2021 IL App (1st) 172020-U

No. 1-17-2020

Order filed May 6, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| vs. | ) ) | No. 14 CR 364 |
| CODERO SIMS, | ) ) | Honorable Diane Gordon Cannon, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court erred when it denied defendant's motion to replace a juror who expressed self-doubt about his ability to be impartial. We reverse defendant's conviction and remand for a new trial.

¶ 2    Following a jury trial, defendant, Codero Sims, was found guilty of attempted first-degree murder and sentenced to a term of 48 years' imprisonment in the Illinois Department of Corrections (IDOC). On appeal, Sims contends (1) the trial court erred when it: (a) denied his motion to replace a juror on the second day of trial, (b) limited *Lynch* evidence, (c) barred the introduction of *Lynch* evidence in Sims's opening statement, (d) failed to instruct the jury on both

the use of *Lynch* evidence pursuant to Illinois Pattern Jury Instruction (IPI) No. 3.12X, and the justifiable use of deadly force to resist a forcible felony, (e) prohibited Sims from introducing an excited utterance he made directly after the shooting, (f) failed to allow Sims to impeach two witnesses with their videotaped prior inconsistent statements; and (2) he received ineffective assistance of trial counsel, where counsel failed to: (a) request IPI No. 3.12X, (b) tender a portion of IPI 24-25.06, (c) introduce Irbinzon Gonzalez's prior conviction, (d) object to the trial court's erroneous ruling barring *Lynch* from being mentioned in opening statements, (e) request the jury be instructed to acquit Sims if it found he acted with an unreasonable belief in the need for self-defense, and (f) argue Sims's sentence should be reduced to a Class 1 felony, pursuant to 720 ILCS 5/8-4(c)(1)(e) (West 2014).

¶ 3        We agree with Sims's first argument that the trial court erred in denying Sims's motion to replace a juror. We, therefore, reverse Sims's conviction for attempted murder, and remand the case for a new trial.[1] Having reached that conclusion, we decline to rule upon Sims's additional arguments.

¶ 4                                                    I. JURISDICTION

¶ 5        The trial court sentenced Sims on July 20, 2017. Thereafter, on July 21, 2017, Sims filed a timely motion to reconsider sentence, which was argued on August 3, 2017. On August 4, 2017, Sims filed a notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1980, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 6                                    II. BACKGROUND

¶ 7            Sims was charged by indictment with multiple counts of, *inter alia*, the first-degree murder of Irbinzon Gonzalez (720 ILCS 5/9-1(A)(1), (A)(2), (A)(3) (West 2014)), the attempted murder of Juan Vicente (720 ILCS 5/8-4 (A); 5/9-1(A)(1) (West 2014)), and armed robbery (720 ILCS 5/18-2(A)(2), (A)(3), (A)(4) (West 2014)). Those charges arose from an incident that occurred in Cook County on November 18, 2013. On that date, Sims and his brother, Rashad Mahone, reached out to a friend, Betsy Valdivia, looking to purchase marijuana. Valdivia called the father of her children, Vicente, and he and Gonzalez agreed to sell marijuana to Sims. During the course of the drug transaction, while inside Gonzalez's vehicle, a gun was introduced. During the ensuing struggle, the gun was fired several times, fatally wounding Gonzalez.

¶ 8            Prior to trial, Sims filed a motion pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1989). *Lynch* allows a defendant to introduce at trial evidence of a victim's violent tendencies for the purpose of supporting the defendant's theory of self-defense. *Id*. Sims requested the trial court allow him to introduce evidence at trial of the violent nature of both Gonzalez and Vicente to demonstrate that they were the initial aggressors. On September 8, 2016, the trial court heard arguments on the motion and ruled that the prior convictions of Vicente and Gonzalez were admissible pursuant to *Lynch*. However, the court also ruled that—while the fact that the convictions existed was admissible—the details surrounding the convictions and arrests would not be admitted. Additionally, the court prohibited defense counsel from referencing the *Lynch* material in its opening statements and from cross-examining witnesses regarding the material during the State's case-in-chief.

¶ 9          On May 9, 2017, jury selection began. The trial court individually questioned prospective jurors, including R.R. and N.B.[2] R.R.—who had never before served on a jury—stated he had previously been a victim of several crimes but believed he could put those out of his mind and judge the case on the evidence presented. N.B., a registered nurse, had never previously served on a jury nor had she been a victim of a crime. R.R. and N.B. were both selected to serve and were sworn as jurors. Sims's jury trial then commenced with the State proceeding on only three counts: felony murder, armed robbery, and attempted murder. On the same date, the jury heard testimony from Gonzalez's fiancée, Monica Aguirre, and Juan Vicente before adjourning for the day.

¶ 10          On May 10, 2017, the morning of the second day of Sims's trial both R.R. and N.B. separately called the courtroom deputies and informed them that they would not be returning to court for the remainder of the trial. After being instructed to come to court, both R.R. and N.B. eventually complied. Defense counsel requested both jurors be individually questioned regarding their refusal to return to court. R.R. explained that he had recently sold his business and had originally purchased a plane ticket to California for May 9, 2017, to help transition the business. R.R. further explained that, after being called for jury duty, he had rescheduled the May 9th flight—at a cost of $550—to May 11, 2017. He stated that rescheduling the flight a second time would cost him close to $1,000. In response to the trial court's questioning regarding why R.R. had not shared his travel plans, he explained he misunderstood and was unaware he was supposed to. The court informed R.R. he was extremely unlikely to make his May 11th flight and inquired if, knowing this, he could give both sides a fair trial. R.R. responded, "Well, I'm not going to be happy about it. I'll be honest with you."

¶ 11          Defense counsel then questioned R.R. in the following exchange:

---

[2] Rather than use the jurors' names, the court will refer to both jurors by their first and last initials.

DEFENSE COUNSEL: Sir, understanding you will be unhappy about it, will that unhappiness, sir, translate to you being possible [*sic*] unfair to either side in this jury?

R.R.: The same thing I will say. I'm not going to be very happy about it. It could influence, but, you know, there are twelve other jurors. I'm sure whatever I think is not going to affect them.

¶ 12    N.B. was then questioned by the court. She explained that she did not initially appear that morning because she had a doctor's appointment for blood work due to an upcoming surgery. N.B. further explained that she was supposed to meet with her surgeon. After N.B. informed the court she would have to postpone meeting with her doctor, the court inquired if, knowing this, she would hold it against either side. N.B. asserted that she would not hold it against either side and could be fair.

¶ 13    Sims then made a motion to strike R.R. from the jury, citing concern over R.R.'s self-doubt regarding his own impartiality. The trial court stated that it is always a financial inconvenience for people to serve on juries and informed the parties it was "disturb[ed]" by the fact that neither juror had earlier mentioned their prior commitments. The trial court stated:

"* * * So, I find both these jurors troubling. Given that, to excuse one, not the other, I think is saying, you know, you won to one, and you lost to the other. He gets to go home and she gets to stay and reschedule her pre-op work. That leaves us with no alternates, which is not going to happen, let's put it that way."

¶ 14    Defense counsel then clarified that there was an important difference between R.R.—who expressed doubt regarding his impartiality—and N.B.—who stated she could be fair. Counsel

reiterated his concerns that R.R.'s unhappiness could lead to partiality. The following exchange between the trial court and defense counsel ensued:

"COURT: There were differences. Truth be told, no juror is happy to be back there. Even if they are, I mean we didn't ask her if she was happy about it, coming here instead of discussing pre-op. [R.R.] said he could be fair.

I'm not going to excuse either of them. Unless both sides agree to excuse both of them. All right. Both sides ready for the jury? Or is that what you want to do. Continue with both jurors?

DEFENSE COUNSEL: Given that option, Judge, we'll continue with the two.

COURT: Well, I'm not going to discriminate against one who didn't tell me, two people that weren't forthright at jury selection. Now both have issues with continuing on as jurors. So, I don't believe monetary reasons on rescheduling a flight, someone says he can try to be fair and not hold it against either side, is a reason to excuse him. If it is, everyone is losing money. Again, happy jurors are few and far between, upon selection. I can see that in their faces."

¶ 15        The following evidence was adduced at trial. Vicente testified he had a 2008 felony conviction for robbery, a 2011 misdemeanor conviction for aggravated assault to a police officer, and a 2013 arrest for domestic battery against Betsy Valdivia—with whom he has two children.

Additionally, Vicente testified that, while he had a pending felony case for aggravated driving under the influence, he had not been offered any consideration in exchange for his testimony.

¶ 16    On November 18, 2013, Vicente received a call from Valdivia. She informed him that she knew someone who was looking to buy a half pound of marijuana. Vicente then called Gonzalez, whom he knew as "Freddie," to obtain the marijuana for Valdivia. After further conversation with Valdivia, they settled on a purchase price of $4,500 in exchange for one pound of marijuana. Vicente and Gonzalez agreed to meet Valdivia and her friends at 6 p.m. at or near the intersection of Winnemac and Western Avenues. Gonzalez then picked Vicente up in a blue BMW and they drove to a Popeye's restaurant, where Vicente bought a soft drink that he mixed with promethazine and codeine. Despite ingesting several sips of the drink, Vicente denied feeling any mental impairment.

¶ 17    Although Gonzalez and Vicente discussed bringing a gun to the deal, they decided they did not need to bring a weapon since they were dealing with Valdivia. Vicente then received another call from Valdivia, requesting that they instead meet in the parking lot at the McDonald's restaurant at the intersection of Lincoln and Western Avenues in Chicago. As Gonzalez pulled into the McDonald's parking lot, he observed a gray SUV which had backed into a parking spot. Gonzalez reversed into a parking spot, leaving one empty parking space between the two vehicles. Vicente did not recognize either male sitting in the front of the SUV and he could not see through the tinted back windows.

¶ 18    Valdivia exited from the rear passenger side of the SUV and entered the back passenger side of Gonzalez's vehicle. Gonzalez then used a knife to cut the sealed bag of marijuana and give Valdivia a small sample. Valdivia returned to the SUV with the sample and Gonzalez closed the folding knife and laid it on the floor of the BMW. Vicente could see two men with their heads

down and assumed they were smelling the sample. Gonzalez became impatient and honked his horn at the SUV. Sims exited the SUV and walked over to the BMW. Vicente told Gonzalez he could drive away, if he wanted to, since they were only supposed to deal with Valdivia. Vicente did not see Sims carrying a gun but saw a "wad" of money, wrapped in a grocery bag, hanging out of Sims's right pocket. Sims entered the back passenger seat of the BMW and asked to view the marijuana to ensure it was the agreed weight. Gonzalez asked Sims if they could see the money, and assured Sims that they were not trying to rob him. Vicente likewise assured Sims they were not trying to rob him and pointed out that Valdivia—the mother of his children—was still in the SUV.

¶ 19        Gonzalez again asked to see the money, and Sims placed the money on his lap. Sims once more asked to view the marijuana and expressed his concern that it did not look like a pound. After Gonzalez repeated his request for the money, Sims placed the bag of money on the center console. Gonzalez then placed the bag of marijuana in between Sims's legs. Vicente, who was looking at his phone, saw Gonzalez shift in the front seat and rip open the bag on the console to view the money. Vicente then saw Gonzalez dive into the backseat. Within a matter of seconds, Vicente heard three shots being fired and twisted around in his seat to see what was happening. Vicente observed Gonzalez fall back into the seat, bleeding, and he saw a black semiautomatic handgun in Sims's left hand. Sims aimed the gun at Vicente, who grabbed the handle of the gun. During the ensuing struggle for the handgun, Vicente pleaded with Sims not to kill him and Sims shouted, " 'Fo, come out and whack this thing." Vicente managed to take control of the gun and had it— and Sims's hand—pinned in the backseat, aimed towards the back door.

¶ 20        Valdivia exited the SUV and walked to the BMW, screaming. Vicente overpowered Sims, dropped the gun, and ran out of the vehicle. As Vicente ran towards the McDonald's, he saw Sims

exit the BMW with the marijuana and the gun. Sims then struck Valdivia, who fell to the ground, and he got back into the SUV. The SUV then exited the parking lot from the exit closest to Vicente. Vicente went to the side of McDonald's and began punching Valdivia. She asked him to call an ambulance for Gonzalez, and he went to the BMW to retrieve his phone. Vicente found his phone lying broken on the ground outside of the vehicle and observed Gonzalez dead inside the BMW. He then returned to Valdivia and continued punching her and pulling her hair. A patron exiting the McDonald's gave Valdivia her phone to call the police.

¶ 21    Vicente—who was carrying $5,000 in his pocket from previous drug transactions—fled the scene and ran to a nearby Burger King restaurant. Inside the Burger King bathroom, Vicente washed Gonzalez's blood off and borrowed a child's phone to call his girlfriend. Approximately 20 minutes later, Vicente's girlfriend picked him up. After calling his mother, Vicente called 911 and told the operator he was in a car when his friend had been killed. Vicente testified that the 911 operator instructed him to remain anonymous. Later that night, Vicente called his lawyer, who recommended he tell detectives what had happened. On November 19, 2013, Vicente spoke to police detectives at the Belmont and Western police station. The following day, Vicente viewed a photo line-up and a physical line-up and identified Sims as the shooter both times. Additionally, Vicente gave a videotaped statement, and, on December 12, 2013, he testified before the grand jury regarding the incident.

¶ 22    On cross-examination, Vicente testified that—during both his first interview and subsequent videotaped interview—he told detectives that Sims exited the BMW with the bag of marijuana. Vicente additionally averred that he testified before the grand jury that Sims left with the marijuana. Defense counsel subsequently impeached Vicente with his grand jury testimony, in which he did not state that Sims fled with the marijuana.

¶ 23    Betsy Valdivia testified that she had two children with Vicente but they were no longer in a romantic relationship. On November 18, 2013, Valdivia was contacted by her friend Rashad Mahone, who was looking to purchase a large amount of marijuana. Valdivia then contacted Vicente and they made an arrangement for Mahone to buy a pound of marijuana for $4,500. Valdivia rode with Mahone and Sims to the McDonald's parking lot to facilitate the drug transaction. Upon Gonzalez and Vicente's arrival, Valdivia entered the BMW and Gonzalez gave her a sample of marijuana. Valdivia returned to the SUV and gave the sample to Mahone, who smelled it and gave it a "yuck face." After passing the marijuana to Sims, Mahone gave Sims money. Sims placed the stack of money inside a plastic grocery bag and exited the SUV with the bag.

¶ 24    Sims entered the back passenger seat of the BMW and Valdivia lost view of him behind the tinted windows. After a while, Mahone told the SUV driver, Jaquan Prince, to honk his horn. The horn sounded and Valdivia then saw the BMW moving as if there was a struggle within. Valdivia saw the silhouette of Gonzalez as he put his hands in the air. As Valdivia exited the SUV and started towards the BMW, she heard gunshots. Sims exited the BMW with the grocery bag that contained the marijuana in his hands. She attempted to grab Sims and they struggled, hitting one another. Sims fled to the SUV and it drove away. Vicente then exited the BMW, "hysterical," and began punching her while blaming her for Gonzalez's death.

¶ 25    Thereafter, they ran towards the McDonald's and asked a couple to call 911. Valdivia told Vicente to leave, but she remained behind to speak to the police. However, she did not tell the police Vicente was present, nor did she explain her role in the drug deal. The following day, she told the police the complete truth about what had occurred. On November 20, 2013, Valdivia viewed a photo line-up and identified Sims and Mahone. Valdivia then gave a videotaped

statement and viewed a physical line-up. She additionally testified to a 2014 conviction for aggravated battery to a police officer and a 2016 felony conviction for cannabis.

¶ 26      On cross-examination, Valdivia testified that, on November 19, 2013, she informed the police detectives that Sims had exited the BMW carrying a plastic bag. Later, during her videotaped statement, she once again told the police that Sims was carrying a plastic bag when he exited the BMW. On December 3, 2013, Valdivia testified she went before the grand jury and attested that Sims left the BMW with a plastic bag in his hands. Defense counsel subsequently impeached Valdivia with her grand jury testimony, in which she detailed her altercation with Sims but did not state that Sims fled with the plastic bag.

¶ 27      Jaquan Prince testified he had been friends with Mahone for over ten years. On November 18, 2013, he was hanging out with Mahone when Mahone received a call from Sims. Prince picked up Sims and then drove them, at the brothers' request, to meet a woman at California and Division. The woman got into the backseat of Prince's Dodge Stratus. Shortly afterward, Prince dropped the woman off. Later, Sims gave Prince the keys to a Nissan SUV and asked Prince to drive them back to California and Division to pick up the woman again. The woman then directed Prince to the McDonald's and he parked the SUV. A blue BMW arrived and parked nearby. The woman exited the SUV, entered the BMW, and then returned to the SUV with a piece of marijuana. Upon inspecting the marijuana, Mahone stated it was "bogus" and told Sims not to buy it. Sims responded that he needed the marijuana. The woman again left the SUV, entered the BMW, then returned.

¶ 28      Upon her return, Sims exited the SUV and entered the backseat of the BMW. Prince did not see any money or a weapon on Sims when he exited the SUV. Minutes later, Prince heard gunshots and saw the BMW rocking. Due to the BMW's tinted windows, Prince was unable to see

anything within the BMW until the back door "flung" open. Prince then observed a man in the front passenger seat and Sims struggling over a gun. Mahone and the woman exited the SUV. Sims and the man in the front passenger seat of the BMW continued their struggle as they exited the BMW. The man from the front seat ran towards the McDonald's, and Sims and Mahone returned to the SUV. Sims was holding a gun and told Prince to "go, go, go." Prince did not see Sims holding anything else. Prince drove back to his car and parted ways with the brothers. Several days later, after Sims was arrested, Prince contacted the police and told them what he had witnessed. Prince also testified before the grand jury on December 12, 2013.

¶ 29        Defense counsel attempted to elicit an alleged statement Prince heard Sims make following his return to the vehicle, but the trial court sustained the State's hearsay objection. Subsequently, outside the presence of the jury, counsel said that Prince would have testified Sims stated, "it was either him or me." Defense counsel argued that this statement should be admitted as an excited utterance. The trial court ruled the statement was hearsay, not an excited utterance, and therefore it would not be admitted.

¶ 30        Forensic Investigator Paul Presnell examined the BMW both at the scene of the shooting— where he observed a deceased male in the driver's seat—and at the auto pound. Presnell collected the following physical evidence from the BMW: three fired cartridge casings from the backseat, a plastic grocery bag with United States Currency inside, two fired bullets from the driver's seat, blood swabs, fingerprint dustings, and a closed black knife on the floor by the male's leg. He noted that he found $2,320 dollars in the male's pocket and that there was no trace of marijuana found within the vehicle.

¶ 31    An autopsy revealed Gonzalez died as a result of multiple gunshot wounds. One bullet entered Gonzalez's left frontal parietal scalp and exited below his left ear before reentering his left chest. The second bullet entered Gonzalez's right posterior scalp and exited his left cheek.

¶ 32    Sims testified he had two prior convictions for the manufacture and delivery of a controlled substance. On November 18, 2013, Sims called Mahone because he wanted to purchase a pound of marijuana. Prince and Mahone picked him up in a white Dodge and they drove to Humboldt Park to meet Valdivia. However, Valdivia informed them that the marijuana was not ready, so they dropped her off. Later that day, Sims got a call that the marijuana was ready. He suggested they switch cars before heading to the deal so that police would be less likely to pull them over. Prince then drove the brothers once more to Humboldt Park to pick up Valdivia. From there, they drove to the McDonald's on Lincoln. Sims testified they were originally supposed to meet on Winnemac, but he changed the location to a public area because he did not want to be robbed.

¶ 33    Prince parked the vehicle and several minutes later, a BMW arrived and parked two spaces away. Valdivia left their vehicle and got into the BMW. She then returned with a sample of marijuana. Mahone stated he did not like the sample and did not think Sims should purchase the marijuana. However, Sims thought the marijuana was "decent" and decided he still wanted to purchase it. Valdivia once more went to the BMW and then returned to their vehicle. Sims then got into the backseat of the BMW. He brought two separate stacks of money with him, a "decoy" stack of $400 - $500 in the pocket of his sweatshirt and a second stack of approximately $4,000 in his pants pocket. Sims asked Gonzalez and Vicente where the marijuana was, and they requested to see his money. In response, Sims showed them the "decoy" money from his sweatshirt pocket. He denied handing the money to Gonzalez.

¶ 34        As Sims never saw any marijuana in the BMW, he decided to leave when he heard the SUV's horn honk. Before he could exit, the driver lunged at him. Vicente pointed a gun at him and said, "you know what time it is." A struggle ensued and the several shots were fired. Sims obtained control of the handgun and Vicente exited the BMW, running towards the McDonald's. Sims also exited the BMW and Valdivia began to attack him. He pushed Valdivia away and ran back to the SUV. Once inside, Sims directed Prince to "go, go." They left the scene and Sims discarded the handgun in an alley a few blocks from the expressway.

¶ 35        Two days later, Sims was arrested. In speaking with the detectives assigned to the case, Sims denied any involvement in the shooting because he was scared. He told detectives instead that he was at his child's mother's house at the time of the shooting. Sims testified he did not remember telling detectives that the preceding statement was the "God's honest truth." Additionally, Sims did not remember telling the detectives that he did not leave his neighborhood the night of the shooting. On both points, Sims was impeached with the video recording of his statement made to police. Sims reaffirmed that he acted to save his life, but admitted he never told detectives this.

¶ 36        Defense counsel requested to perfect his impeachment of Valdivia and Vicente by introducing their videotaped statements to the jury, in which neither stated they saw Sims get out of the BMW with the bag of marijuana. The court denied counsel's request, finding that the videotaped statements were prior consistent statements and would only impeach by omission.

¶ 37        Chicago Police Detective Adrian Garcia testified he twice interviewed Vicente at the police station and was present for Vicente's videotaped statement with an Assistant State's Attorney ("ASA"). At no time did Vicente tell Garcia that he saw Sims holding a bag of marijuana as he exited the BMW. Detective Garcia also interviewed Valdivia twice and was present for her

videotaped statement with an ASA. At no time did Valdivia say that she attempted to grab a bag of marijuana from Sims as he exited the BMW.

¶ 38       Before the defense rested, counsel indicated that he wanted to proceed by way of stipulation that Vicente and Valdivia never mentioned seeing Sims with the bag of marijuana during their videotaped statements to the ASA. The State argued that it no longer wanted to stipulate, as the evidence had already been introduced during Detective Garcia's testimony. The trial court ruled that the defense had already perfected impeachment through Detective Garcia's testimony and could not introduce cumulative sources of the same impeachment.

¶ 39       Defense counsel then requested leave to call two *Lynch* witnesses, arguing that Vicente's prior convictions had only been admitted for impeachment and not *Lynch* purposes. The court denied defense counsel's motion, finding that with Vicente's testimony, they had already "run far afield of *Lynch* material at this time."

¶ 40       During the jury instruction conference, defense counsel asked for a second-degree murder instruction. The court ruled the instruction would not be given, as Sims was charged with felony murder. Defense counsel next asked for a *Lynch* instruction with respect to the attempted murder charge. The court asked counsel which *Lynch* instruction he was referring to. Counsel stated that if there was not a relevant IPI instruction, he would request a non-IPI instruction. The court responded that counsel was free to argue *Lynch* evidence to the jury, but it did not know what instruction the defense wanted the jury given.

¶ 41       After deliberations, the jury acquitted Sims of armed robbery and the felony murder of Gonzalez. The jury returned a verdict of guilty for the attempted murder of Vicente.

¶ 42 On July 20, 2017, after listening to arguments in mitigation and aggravation, the court sentenced Sims to a term of 50 years in IDOC. Following arguments on Sims's motion to reconsider his sentence, the trial court sentenced Sims to 48 years in IDOC.

¶ 43         III. ANALYSIS

¶ 44      A. Denial of Sims's Motion to Strike Juror

¶ 45 On this direct appeal, Sims first contends that the trial court erred when it denied his motion to replace a juror on the second day of trial.

¶ 46 "A criminal defendant's right to trial by a fair and impartial jury is firmly rooted in our constitution." *People v. Stone*, 61 Ill. App. 3d 654, 666 (1978). The right to an impartial jury is such a basic right that a reversal is required when that right is violated. *People v. Cole*, 54 Ill. 2d 401, 411 (1973) [Citations.] "While impartiality is not a 'technical conception," it is a state of mind which must be ascertained from the statements made by the prospective jurors." *Stone*, 61 Ill. App. 3d at 667. See also *Cole*, 54 Ill. 2d at 413.

¶ 47 The determination of whether a prospective juror possesses the state of mind which enables them to give a defendant a fair and impartial trial rests in the sound discretion of the trial judge. *People v. Kuntu*, 196 Ill.2d 105 (2001); *People v. Harris*, 2020 IL App (5th) 160454. A trial judge's determination will only be set aside if it is contrary to the manifest weight of the evidence. *Cole*, 54 Ill. 2d at 414. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *People v. Sanchez*, 2021 IL App (3d) 170410 (citing *People v. Deleon*, 227 Ill. 2d 322 (2008)). Where a juror expresses "self-doubt concerning their ability to be impartial," a court may reverse a defendant's conviction. *People v. Johnson*, 215 Ill. App. 3d 713, 724 (1991) (citing *People v. Stone*, 61 Ill. App. 3d at 667).

¶ 48        In the instant case, we find that the trial judge's determination with respect to the challenge against R.R. was against the manifest weight of the evidence. (See *Cole*, 54 Ill. 2d at 414). On the morning of the second day of trial, both R.R. and N.B. called the courtroom deputies to inform them that they had no intention of coming to court for the remainder of the trial. After being instructed to come to court, both R.R. and N.B. finally appeared. Defense counsel requested both jurors be individually questioned regarding their refusal to return to court. Juror N.B. had failed to inform the court of her prior commitment with her surgeon and called three times that morning to insist she would not be coming in. However, after questioning regarding her reluctance to come to court, N.B. stated she could be fair and would not hold her inconvenience against either side. Juror R.R. failed to inform the court of his prior commitment out of state and made it very clear that he was unhappy regarding the financial hardship he was facing.

¶ 49        Upon informing R.R. that he would be unable to make his flight to California, the trial court pointedly asked R.R. if he could nonetheless be fair and impartial. R.R. equivocated, stating, "[w]ell, I'm not going to be happy about it. I'll be honest with you." Defense counsel questioned R.R. about whether his unhappiness would translate to him being unfair to either side. R.R. responded, "The same thing I will say. I'm not going to be very happy about it. It could influence, but, you know, there are twelve other jurors. I'm sure whatever I think is not going to affect them." Despite the court's statement that R.R. said he could be fair, R.R. never once professed his ability to remain impartial. On the contrary, he specifically stated his unhappiness *could* influence his ability to be fair to both sides. Furthermore, he qualified his statement by expounding that his potential unfairness was unlikely to affect the other jurors sitting on the panel. R.R. openly expressed self-doubt concerning his ability to remain impartial. Furthermore, during the initial *voir dire*, while R.R. eventually stated he believed he could try to judge the case on the evidence

presented, he originally equivocated when asked by the trial court if he could be fair and impartial. He testified he had thrice been a victim of a crime and, when asked if he could put those incidents out of his mind, he responded, "I guess I would try to, but I mean it is still in the back of my mind." For the aforementioned reasons, R.R. should have been dismissed for cause upon Sims' motion. Accordingly, the trial judge's determination with respect to R.R. was against the manifest weight of the evidence. Consequently, Sims's right to a fair and impartial trial was violated. (See *Stone*, 61 Ill. App. 3d at 666-667).

¶ 50        Even more concerning, despite the trial court finding both jurors "troubling," the trial court nonetheless allowed both jurors to remain impaneled. The trial court stated it was "disturb[ed]" by both jurors' lack of candor and indicated it would not let one juror win and the other juror lose. Therefore, it held that neither juror would be excused unless both sides agreed to excuse both jurors. In response, defense counsel stated, "[g]iven that option, Judge, we'll continue with the two."

¶ 51        Contrary to the State's claim, we do not find that Sims "expressly acquiesced" to the trial court's ruling regarding the continued empanelment of R.R. Rather, we find that the trial court improperly conditioned the removal of one juror upon the removal of another. Sims was faced with a Sophie's Choice[3]—to remove the juror who stated his fairness could be affected by his anger, Sims would have to voluntarily dismiss the juror who stated she could be fair and would not hold her inconvenience against either party. To condition the removal of a potentially biased juror upon the removal of a fair and unbiased juror is inappropriate.

---

[3] Sophie's choice is defined as "an extremely difficult decision a person has to make. It describes a situation where no outcome is preferable over the other. This can be either because both outcomes are equally desirable or both are equally undesirable." Dictionary.com, https://www.dictionary.com/e/slang/sophies-choice/ (last visited April 27, 2021).

¶ 52    We hold that the trial court erred when it denied defendant's motion to replace juror R.R. by improperly conditioning the removal of juror R.R.—who expressed self-doubt about his ability to be impartial—upon the removal of juror N.B.—who stated she could be fair. We therefore reverse Sims's conviction and remand the cause for a new trial. We note that double jeopardy does not attach since the evidence at trial was sufficient to sustain the verdict. *People v. Drake*, 2019 IL 123734; *People v. Moore*, 121 Ill. App. 3d 570 (3rd Dist. 1984); *Burks v. U.S.*, 437 U.S. 1 (1978).

¶ 53                    B. Further Trial Court Error and Ineffective Assistance of Counsel

¶ 54    Sims additionally contends that (1) the trial court erred where it: (a) limited *Lynch* evidence, (b) barred the introduction of *Lynch* evidence in Sims's opening statement, (c) failed to instruct the jury on both the use of *Lynch* evidence pursuant to IPI No. 3.12X, and the justifiable use of deadly force to resist a forcible felony, (d) prohibited Sims from introducing an excited utterance he made directly after the shooting, and (e) failed to allow Sims to impeach two witnesses with their videotaped prior inconsistent statements; and (2) he received ineffective assistance of trial counsel, where counsel failed to: (a) request IPI No. 3.12X, (b) tender a portion of IPI 24-25.06, (c) introduce Gonzalez's prior conviction, (d) object to the trial court's erroneous ruling barring *Lynch* from being mentioned in opening statements, (e) request the jury be instructed to acquit Sims if it found he acted with an unreasonable belief in the need for self-defense, and (f) argue Sims's sentence should be reduced to a Class 1 felony, pursuant to 720 ILCS 5/8-4(c)(1)(e) (West 2014). Because we have already determined that a reversal and remand for new trial is required in this case, we decline to rule upon defendant's subsequent points of contention.

¶ 55                                    IV. CONCLUSION

¶ 56    Based on the foregoing, we reverse Sims's conviction for attempted murder and remand for a new trial.

No. 1-17-2020

¶ 57    Reversed and remanded.