2025 IL App (1st) 241235

No. 1-24-1235

Opinion filed November 13, 2025

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL EVARD, SUE WIECHMANN, MICHAEL ORREL, and RONALD E. BRYAN, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | Nos. 19 L 11574 |
| | ) | 22 L 8925 |
| v. | ) ) | 22 L 8927 22 L 8928 |
| | ) | |
| MONSANTO COMPANY, | ) ) | Honorable Sandra G. Ramos, |
| Defendant-Appellee. | ) ) | Judge Presiding. |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court, with opinion.
Justices Mikva and Mitchell concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs Michael Evard, Sue Wiechmann, Michael Orrel, and Ronald E. Bryan (collectively referred to as plaintiffs) sued Monsanto Company (Monsanto), claiming that their use of the herbicide, Roundup, and their exposure to polychlorinated biphenyls (PCBs)—both designed, manufactured, and distributed by Monsanto—caused them to develop non-Hodgkin's lymphoma. During a jury trial, plaintiffs unsuccessfully sought to remove an allegedly biased juror, and, as the trial was nearing completion, their two lead trial attorneys contracted COVID-19

with symptoms precluding their continued participation at trial, either in person or remotely. Despite the unavailability of plaintiffs' lead trial attorneys, the trial court denied their motion for a continuance or mistrial. Additionally, over plaintiffs' objection, the court provided the jury with the "short form," rather than the "long form," of Illinois Pattern Jury Instructions, Civil, No. 15.01 (rev. Aug. 2021) (hereinafter IPI Civil No. 15.01)—the instruction on proximate cause. Ultimately, the jury returned a verdict in favor of Monsanto on all of plaintiffs' claims, and the court entered judgment on that verdict. Plaintiffs now appeal, contending that the trial court erred by (1) providing the jury with the short form of IPI Civil No. 15.01; (2) not removing the allegedly biased juror; and (3) not granting them a continuance or, in the alternative, a mistrial, when their two lead trial attorneys contracted COVID-19. For the reasons that follow, we affirm the judgment for Monsanto.

¶ 2                                    I. BACKGROUND

¶ 3      Throughout their lives, plaintiffs, all residents of Illinois, used various formulations of Roundup, a widely used glyphosate-based herbicide designed, manufactured, and distributed by Monsanto. Plaintiffs also had been exposed to PCBs, manmade forever chemicals that were part of various consumer and commercial products, the production of which had been banned by the United States Environmental Protection Agency in the 1970s. Products containing PCBs were produced, sold, and distributed by a now-defunct company. Due to various corporate transactions, Monsanto is now responsible for the defunct company's legacy liabilities. During their lifetimes, plaintiffs all developed non-Hodgkin's lymphoma, a type of blood cancer.

¶ 4      In October 2019, believing that PCBs and Roundup caused their cancer, plaintiffs—along with Sonia Martin-Ahmed and Angela Hays as next of friend of Antoine M. Wickliffe—sued Monsanto, along with several other defendants under various causes of action. Through various

motions, the trial court allowed the claims of Hays, as next of friend of Wickliffe, to be nonsuited and dismissed with prejudice all of the defendants except for Monsanto.

¶ 5    In October 2022, the trial court administratively dismissed Wiechmann, Orrel, Bryan, and Martin-Ahmed with leave to refile because they were not related to Evard, the first-named plaintiff. To this end, Bryan (in case number 22 L 8925), Orrel (in case number 22 L 8927), and Wiechmann (in case number 22 L 8928) filed individual complaints against Monsanto. On their motions, the court consolidated their cases with Evard's for trial. Martin-Ahmed refiled her action but did not move to consolidate her case with Evard's.

¶ 6    With their cases consolidated, Evard, Wiechmann, Orrel, and Bryan together filed a third amended complaint—the operative pleading in this case—against Monsanto, raising causes of action for strict liability (design defect and failure to warn), negligence, breach of implied warranties, and willful and wanton misconduct. Plaintiffs sought compensatory damages and punitive damages, among other relief. After several days of argument on the parties' motions *in limine*, the case proceeded to a jury trial, where plaintiffs pursued claims of strict liability (design defect) with respect to PCBs, strict liability (failure to warn) with respect to Roundup, negligence with respect to Roundup and PCBs, and willful and wanton misconduct with respect to both.

¶ 7    On July 27, 2023, jury selection commenced and continued for two days. After the jury was selected and prior to opening statements, one of the jurors, C.M., expressed frustration with having been selected, which caused the trial court to admonish him. On August 1, 2023, the parties made their opening statements, during which a sidebar occurred where an attorney for plaintiffs objected to C.M.'s presence on the jury. The court allowed C.M. to remain on the jury, and following opening statements, plaintiffs began their case with two weeks of expert testimony.

¶ 8       On August 15, 2023, the trial court received a letter from C.M., which he had written the day prior. In the letter, C.M. apologized for his earlier behavior, but also criticized the preparedness of plaintiffs' attorneys and their presentation of the case. The court brought C.M. into its chambers and questioned him about the letter and his ability to remain a juror. Despite plaintiffs' request to remove him, the court allowed C.M. to remain a juror. Plaintiffs continued their case with additional expert testimony and testimony from each plaintiff. In the morning of August 21, 2023, they rested their case.

¶ 9       In the afternoon of August 21, 2023, Monsanto began its case with an adverse witness. Over the next four days—through Friday, August 25, 2023—Monsanto presented the testimony of experts and one of its senior employees. On Monday, August 28, 2023, Walter Cubberly, one of plaintiffs' attorneys, informed the trial court that Allen Stewart, one of plaintiffs' lead trial attorneys, had tested positive for COVID-19 and Scott Frieling, plaintiffs' other lead trial attorney, was symptomatic for COVID-19. Due to their illnesses, plaintiffs orally moved for a mistrial, but the court denied the request. Later that night, plaintiffs filed a written motion seeking a continuance or, in the alternative, a mistrial, in part, because Stewart and Frieling, who had since tested positive for COVID-19, were too sick to effectively represent them. The next day, the court denied plaintiffs' written motion, leading to them finishing the trial without Stewart and Frieling. Monsanto continued with its case, which culminated in the early afternoon of August 31, 2023.

¶ 10      During a jury instructions conference, plaintiffs proposed the long form of IPI Civil No. 15.01, which defined proximate cause, while Monsanto proposed the short form of the instruction. The trial court agreed with Monsanto and provided the jury with the short form of IPI Civil No. 15.01, which read: "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiffs' injury."

¶ 11    On September 1, 2023, the parties made their closing arguments, and the jury subsequently began its deliberations. Less than 3.5 hours later, the jury reached a verdict, finding in favor of Monsanto and against plaintiffs on all claims. The trial court accordingly entered judgment on the jury's verdict. Plaintiffs filed a motion for new trial, alleging various errors by the court, including providing the jury with the short form of IPI Civil No. 15.01, failing to remove C.M. from the jury, and refusing to grant a continuance or mistrial after Stewart and Frieling contracted COVID-19. The court denied plaintiffs' posttrial motion.

¶ 12    This appeal followed.

¶ 13                                    II. ANALYSIS

¶ 14                        A. IPI Civil No. 15.01—Instruction on Proximate Cause

¶ 15    Plaintiffs first contend that the trial court erred by failing to give the jury the long form instruction of IPI Civil No. 15.01, defining proximate cause, because there can be many causes of an injury and Monsanto relied almost entirely on the existence of other causes for their non-Hodgkin's lymphoma as its chief defense. According to plaintiffs, because proximate cause was the critical issue at trial, the court's failure to give the long form instruction of IPI Civil No. 15.01 was reversible error.

¶ 16    Plaintiffs proposed the long form of IPI Civil No. 15.01, which read:

"When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiffs' injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

Monsanto proposed the short form of the instruction, which omitted the last two sentences. The trial court agreed with Monsanto, explaining that, although there were two chemicals produced by

Monsanto at issue—Roundup and PCBs—Monsanto was the only defendant. The court accordingly provided the jury with the short form of IPI Civil No. 15.01, which provided: "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiffs' injury."

¶ 17    "[C]ivil litigants are entitled to have the jury instructed on the issues presented, the applicable legal principles, and the facts that must be proved to support a verdict." *Bailey v. Mercy Hospital & Medical Center*, 2021 IL 126748, ¶ 41. The trial court retains discretion to determine what instructions should be provided to the jury. *Id.* And thus, generally, we review the court's decision with respect to which instructions to provide for an abuse of discretion. *Id.* ¶ 42. "The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." (Internal quotation marks omitted.) *Id.* Even if there is an instructional error, a party is entitled to a new trial only where the error "result[ed] in serious prejudice to the party's right to a fair trial." *Id.*

¶ 18    "There may be more than one proximate cause of an injury ***." *Bentley v. Saunemin Township*, 83 Ill. 2d 10, 17 (1980). Although related, proximate cause and negligent cause are not synonymous. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 522 (2000). This is because a plaintiff's injury can be proximately caused by negligent causes and nonnegligent causes. See *id.* at 523. Regardless of how many proximate causes there are of a plaintiff's injury, if the defendant's negligence is one of them, "liability attaches, no matter how many other negligent acts also contributed to the injury—be they the acts of a codefendant at trial, a nonparty, or some condition like the weather." *Douglas v. Arlington Park Racecourse, LLC*, 2018 IL App (1st) 162962, ¶ 56.

¶ 19    Consistent with the principles of proximate cause—namely, that there can be multiple proximate causes of a plaintiff's injury—IPI Civil No. 15.01 provides:

"When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.]"

When the first sentence is given alone, this is known as the "short form" of the instruction. See *Smith v. Marvin*, 377 Ill. App. 3d 562, 566 (2007). The first sentence must always be given. See IPI Civil No. 15.01, Notes on Use (rev. Oct. 2021). When the second and third sentences are included, this is known as the "long form" of the instruction. See *Smith*, 377 Ill. App. 3d at 566. The notes of use to IPI Civil No. 15.01 state:

"This instruction in its entirety should be used when there is evidence of a concurring or contributing cause to the injury or death. In cases where there is no evidence that the conduct of any person other than a single defendant was a concurring or contributing cause, the short version without the bracketed material may be used." IPI Civil No. 15.01, Notes on Use (rev. Oct. 2021).

¶ 20    The comment to IPI Civil No. 15.01 states that "[a]n instruction encompassing the bracketed material *** is proper where there is evidence that something or the acts of someone other than the negligence of the defendant *** was a proximate cause of the injury or death." IPI Civil No. 15.01, Comment (rev. Oct. 2021). In reconciling the notes of use reference to "any person other than a single defendant" with the comment's reference to "evidence that something or the acts of someone other than the negligence of the defendant," this court has concluded that "use of the long form seems to be preferred, considering adoption of comparative negligence, with suggested use of the short form being discretionary, rather than mandatory, in situations where there is only one plaintiff and one defendant." *Lewis v. Cotton Belt Route-St. Louis Southwestern*

*Ry. Co.*, 217 Ill. App. 3d 94, 115 (1991). The general rationale is that, in a case involving one defendant, the long form instruction could, in certain circumstances, cause the jury to speculate about other causes of a plaintiff's injury when no evidence exists. See *Casey v. Baseden*, 111 Ill. 2d 341, 348-49 (1986).

¶ 21 But merely because the short-form instruction may be used in situations where there is only one defendant, that does not prevent a plaintiff from arguing that liability attaches as long as the defendant's acts were *a* proximate cause of the plaintiff's injury, if other causes existed. See *Webb v. Angell*, 155 Ill. App. 3d 848, 856 (1987) (observing that "[i]f there had been evidence of other causes in the case before us," the short form of IPI Civil No. 15.01 "would not have deterred plaintiff from arguing to the jurors that they could find defendants liable even though their negligence concurred with those other causes"); *Willson v. Pepich*, 119 Ill. App. 3d 552, 558 (1983) (observing that the short form of IPI Civil No. 15.01 "in no way suggests to the jury that they are limited to a determination of a single cause for plaintiff's injuries"). Indeed, the phrase "a cause" in the short form of IPI Civil No. 15.01 "adequately inform[s] the jurors that they [are] not limited to determining a single cause for plaintiff's injury." *Hajian* v. *Holy Family Hospital*, 273 Ill. App. 3d 932, 941 (1995); see *Martinez v. Loud*, 2021 IL App (2d) 200414-U, ¶ 55 (observing that "[t]he reference in the short form to 'a' cause adequately informs jurors that they are not limited to determining a single cause for the plaintiff's injury").

¶ 22 In the instant case, when providing the jury with the short form of IPI Civil No. 15.01, the trial court explained that it did so because there was only one defendant—Monsanto—at issue. See *Lewis*, 217 Ill. App. 3d at 115. And while Monsanto presented evidence of other potential causes of plaintiffs' cancer, such as genetic replication errors, there was no evidence that the conduct of any person other than Monsanto was a concurring or contributing cause, meaning the short form

"may" be used. See IPI Civil No. 15.01, Notes on Use (rev. Oct. 2021). Moreover, because the short form's use of "a cause" informed the jury that they were not limited to determining a single cause of plaintiffs' injuries (see *Hajian*, 273 Ill. App. 3d at 941), there is no question that the short form of IPI Civil No. 15.01 accurately conveyed the law of proximate cause to the jury. But merely because the short form of IPI Civil No. 15.01 could have been used in this case, does not mean the short form was the most appropriate instruction.

¶ 23    In our view, using the long form of IPI Civil No. 15.01 would have been preferable in this complex case, where cause was very much at issue and likely preferable in any case where a defendant argues that something or someone else caused the plaintiff's injury. In this case, the long form would have reiterated to the jury that, even if it believed there were other causes of plaintiffs' cancer, such as genetic replication errors, as long as it believed that either PCBs or Roundup contributed to their cancer, Monsanto would have to be found liable. See *Smith*, 377 Ill. App. 3d at 568 (use of the long form of IPI Civil No. 15.01 was proper where a plaintiff sued a doctor and her employer for malpractice during surgery because the defendants argued something other than their negligence, *i.e.*, a gathering of fluid beneath the skin, caused the plaintiff's injury); *Chambers v. Rush-Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d 458, 467 (1987) (use of the long form of IPI Civil No. 15.01 proper where a plaintiff sued a doctor and his employer for malpractice after the plaintiff's decedent fell into a coma and died because the defendants argued that something other than their negligence, *i.e.*, the decedent's existing cancer, caused his death). Indeed, as the comment to IPI Civil No. 15.01 notes, "it will rarely be error to give" the long form of IPI Civil No. 15.01 (see IPI Civil No. 15.01, Comment (rev. Oct. 2021)), because the long form merely restates, consistent with the law on proximate cause, that "liability attaches, no matter how many other negligent acts also contributed to the injury—be they the acts of a codefendant at trial,

a nonparty, or some condition like the weather." *Douglas*, 2018 IL App (1st) 162962, ¶ 56. This preference for the long form is not negated simply by the fact that there were no defendants, other than Monsanto, in this case.

¶ 24 Although the long form of IPI Civil No. 15.01 would have been preferable here to reiterate to the jury that it could find Monsanto liable even if there were other non-Monsanto causes of the plaintiffs' cancer, "it is not always error to use the short form of the proximate cause instruction even when the long form is preferable." *Campbell v. Wagner*, 303 Ill. App. 3d 609, 614 (1999). Indeed, in *Campbell*, the plaintiff suffered a perforated colon during a hysterectomy, which she argued could have been the result of a hematoma and her surgeon nicking her colon. *Id.* at 613. The surgeon and her employer, however, argued that the hematoma caused the perforated colon. *Id.* Although the appellate court hinted that the long form of IPI Civil No. 15.01 might have been preferable, it found no abuse of discretion by the trial court in providing the short form of IPI Civil No. 15.01. *Campbell*, 303 Ill. App. 3d at 613-14. The appellate court reasoned that the short form was proper because "[t]he only person's negligence alleged to have caused the injury was that of [the surgeon]," even though the hematoma, which no one argued was the result of negligence, was a possible cause of the perforated colon. *Id.* at 614. The appellate court further observed that the "[p]laintiff had the opportunity to and did argue that the presence of the hematoma did not relieve [the surgeon and her employer] of liability" and the short form of IPI Civil No. 15.01 "did not require the jury to find" that the surgeon's alleged malpractice was the only cause of the plaintiff's injury for liability to attach. *Id*.

¶ 25 Turning back to the instant case, the trial court provided the short form to the jury with the same rationale as in *Lewis* because Monsanto was the only defendant (see *Lewis*, 217 Ill. App. 3d at 115) and the notes of use allow the short form to be used when "there is no evidence that the

conduct of any person other than a single defendant was a concurring or contributing cause." See

IPI Civil No. 15.01, Notes on Use (rev. Oct. 2021). Furthermore, the short form accurately

conveyed the law of proximate cause to the jury, and it did not limit the jury to determining a

single cause of plaintiffs' cancer. See *Hajian*, 273 Ill. App. 3d at 941. In addition, plaintiffs do not

claim that any other jury instructions were incorrect statements of the law or improperly provided

to the jury. While the absence of another defendant did not mean that the short form of IPI Civil

No. 15.01 was the most appropriate instruction, under these circumstances, the jury instructions,

taken as a whole, accurately stated the law and were sufficiently clear so as not to mislead the jury.

Consequently, we cannot say the trial court abused its discretion by providing the jury with the

short form of IPI Civil No. 15.01.

¶ 26    Moreover, during closing arguments, plaintiffs repeatedly argued to the jury that there

could be multiple causes of their cancer. In fact, plaintiffs told the jury that, in order to find they

had established proximate causation, it only had to find that Roundup or PCBs was " 'a cause,' "

not " 'the cause' " of their cancer, noting "[t]hat article makes a big difference." During

Monsanto's closing argument, it argued that neither PCBs nor Roundup cause cancer and that non-

Hodgkin's lymphoma was almost always caused by genetic replication errors, with very few

incidences of cases being caused by environmental factors. Based on Monsanto's line of argument,

during rebuttal closing argument, plaintiffs expounded on the "a cause" versus "the cause"

dichotomy, observing that

> "the law is right in accordance with the generally accepted theory about how cancer
>
> happens. *** Cancer is multifactorial, you can have more than one contributing cause.
>
> That's generally accepted. So if somebody is in the jury room saying, [']Oh, that wasn't

the only cause,['] you can have replication errors and Roundup exposure, and they can both contribute to cancer."

Despite the trial court not providing the jury with the long form of IPI Civil No. 15.01, through their closing arguments, plaintiffs explained to the jury, in essence, what was contained in the long form of IPI Civil No. 15.01. See *Johnson v. Advocate Health & Hospitals Corp.*, 2025 IL App (1st) 230087, ¶¶ 70, 72 (no prejudice, and thus no reversible error, where the trial court failed to provide the jury with an instruction, as requested by the defendant, where, in part, during closing arguments, the defendant argued consistently with the rejected instruction).

¶ 27 Still, plaintiffs highlight *Vlahovich v. Betts Machine Co.*, 45 Ill. 2d 506 (1970), and argue that the case controls the instant circumstances and requires reversal. There, while the plaintiff attempted to change a lightbulb on his tractor-trailer, the lens of the light shattered and injured his eye. *Id.* at 507. The plaintiff argued that the lens, which was manufactured by the defendant, was unreasonably dangerous and proximately caused his injury. *Id.* at 509. At trial, over the plaintiff's objection, the trial court provided the jury with the short form of IPI Civil No. 15.01, which read substantially the same as the current version. *Id.* at 512. The court also provided the jury with an instruction on the plaintiff's burden of proof to prove strict liability. *Id.* at 507. The instruction informed the jury that the plaintiff had to prove his injury resulted from a condition of the lens, the condition of the lens was unreasonably dangerous, the unreasonably dangerous condition of the lens existed at the time it left the control of the defendant, and the unreasonably dangerous condition "was the proximate cause of [the] plaintiff's injury." (Internal quotation marks omitted.) *Id.* at 512. The jury ultimately found in favor of the defendant. *Id.* at 507.

¶ 28 Before the supreme court, the plaintiff contended that the trial court's use of the short form of IPI Civil No. 15.01 was reversible error. *Id.* at 511. In addressing the contention, our supreme

court noted the evidence at trial supported multiple theories of causation, including that the lens was unreasonably dangerous but the plaintiff failed to follow the directions to safely remove the light bulb or that he or others failed to properly maintain a component of the light bulb that assisted in removal. *Id.* at 513. In finding that reversible error occurred, our supreme court held that, together, the short form of IPI Civil No. 15.01 and the burden of proof instruction "were unduly restrictive, did not permit the jury to consider the possible concurrent causes in evidence, and did not furnish proper guidance to the jury." *Id.*

¶ 29 *Vlahovich* is not a case where our supreme court reversed the trial court because it improperly provided the jury with IPI Civil No. 15.01. Rather, it was the trial court's use of the short form of IPI Civil No. 15.01 in conjunction with the burden of proof instruction that necessitated reversal—an instruction informing the jury, in part, that, to prove strict liability, the plaintiff had to show the unreasonably dangerous condition was *the* proximate cause of his injury. Together, these instructions unduly restricted the jury's consideration of possible concurrent causes. In the present, there is only one instruction at issue, IPI Civil No. 15.01, the short form of which "adequately informed the jurors that they were not limited to determining a single cause for" the injuries to plaintiffs. *Hajian*, 273 Ill. App. 3d at 941.

¶ 30 Plaintiffs further rely on other cases, including *Lange v. Freund*, 367 Ill. App. 3d 641 (2006), but the portion of *Lange* discussing IPI Civil No. 15.01 is unpublished and may not be cited except in limited circumstances not present here. See Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025). Another case plaintiffs rely on, *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396, 404-08 (1992), involves the sole-proximate cause instruction, formerly contained in Illinois Pattern Jury Instructions, Civil, Nos. 12.04 and 12.05 but now part of the second paragraph of IPI Civil No. 15.01. However, the present case does not involve the sole-proximate cause instruction; therefore,

*Ellig* is of limited value. In sum, the trial court did not abuse its discretion by providing the jury with the short form of IPI Civil No. 15.01.

¶ 31                                    B. Juror C.M.

¶ 32    Plaintiffs next contend that the trial court committed reversible error by failing to remove C.M. from the jury where, according to plaintiffs, he openly voiced bias and animosity toward them and their attorneys, seemed to prejudge the outcome of the case in Monsanto's favor, and equivocated, at best, on his duty to remain impartial.

¶ 33    Although we have briefly discussed C.M. already, more detail is required. During jury selection, the trial court held an initial screening phrase, attempting to remove any prospective jurors based on hardship, given the expected length of the trial and obvious bias due to preexisting opinions about Monsanto in light of the company's ubiquity in the news related to cancer. In the initial phase, in a response on a jury questionnaire, C.M. stated that he was aware of litigation and settlements involving Monsanto. When the court asked him whether he could set aside his preexisting knowledge and determine the case based solely on what he learned in the trial, C.M. responded that he had "a pretty strong opinion" based on his preexisting knowledge. The court asked him again if he could set aside that opinion and treat the parties equally to which C.M. replied, "[u]h-huh, okay." During a discussion among the parties about C.M., one of Monsanto's attorneys suggested striking him for cause, fearing that he "could poison the entire panel." An attorney for plaintiffs, however, remarked that C.M. told the court he could set aside his opinion. The court allowed C.M. to advance to the next round of jury selection, where the court read the prospective jurors a statement of the case and the parties' attorneys were able to question them.

¶ 34    An attorney for plaintiffs questioned C.M. on his history with Roundup, where C.M. stated that he had used Roundup perhaps once a month for approximately 30 years, beginning when he

bought a house. C.M. further remarked that his family grew up on a farm where Roundup was used, and multiple family members, including his mother, who grew up on that farm, passed away from cancer. C.M. believed that Roundup could "be a very dangerous product if used incorrectly." Later during questioning, C.M. indicated that he was worried about serving on a month-long trial because of his job as a commissioned salesperson, noting it was "a big ask." During questioning by a Monsanto attorney about PCBs, C.M. stated that he thought "high concentrations" of them were harmful. The parties did not move to strike C.M. for cause, and he was selected to the jury.

¶ 35    Prior to opening statements, the trial court observed that multiple jurors had raised "some issues," though it did not expound, except to say that, "whatever it is," they would stay on the jury with the possible exception of one juror who had a medical issue. According to an attorney for plaintiffs, in an incident with C.M. that occurred off the record, C.M. told another attorney of plaintiffs: " 'I'm not going to listen. I told you during *voir dire* this was a problem.' " Back on the record and outside the presence of the other jurors, the court warned C.M. that he could not "castigate the parties" because he was selected to serve on the jury. C.M. responded, "I understand." The court admonished C.M. that:

> "You will give it all of your attention or you will be found in contempt of court. A great deal of resources were spent by the parties and time and energy, and if you haven't looked around you, they are ready to go to trial. And for you to come in here as a selected juror and state you are going to give it zero attention is unacceptable."

The court instructed C.M. to go back to the jury room, and plaintiffs began their opening statement.

¶ 36    During plaintiffs' opening statement, a Monsanto attorney objected to a remark, leading to a sidebar. During that sidebar, an attorney for plaintiffs raised an objection to C.M.'s presence on

the jury, though the attorney did not explain the basis of the objection, only adding, "I understand how you ruled," referring to the trial court. Thereafter, plaintiffs concluded their opening statement, Monsanto made its own and plaintiffs began their case.

¶ 37    On the 10th day of trial—still in the plaintiffs' case—C.M. wrote a letter to the trial court stating:

> "Dear Judge Ramos, I feel this correspondence is well overdue on my part. I want to first and foremost apologize for the behavior and attitude I displayed on the initial day of jury duty. It was simply my frustration, and I did not mean any disrespect to you or the court. I truly appreciate your efforts in trying to get the case moving along, and I would like to thank you for your attentiveness to the 4:30 [p.m.] dismissal each day.
>
> I do want to respectfully state that it seems the plaintiffs' counsel is woefully ill prepared, disorganized, and generally taking too long to make their points or they feel they need to make the same point multiple times with each witness. I admittedly have no law training whatsoever and understand that certain procedural elements must be adhered to, but we are now ten days working into this case. To date, there has been little actual testimony directly related to the individual plaintiffs and/or Roundup.
>
> I, of course, am keeping an open mind and have no prejudgments regarding the outcome of the case. As I stated on the first day of trial, albeit in a long tongue, I'm a commissioned salesperson. Short of the $35-a-day check, I'm not getting paid during this lengthy ordeal. I would appreciate anything you could do to convey this message to all of the parties involved.

Thank you for your consideration, cordially, [C.M.]"

¶ 38    The trial court received the letter the following day, and its initial reaction was concern that he had shared his thoughts with other jurors and could be "toxic" to them. However, the court was also concerned with the number of jurors, as another juror had to be excused based on a medical issue and other jurors were having issues being on a lengthy trial. The court noted if it were to remove C.M. from the jury, it would want to do so "discretely" to avoid other jurors learning about C.M.'s opinion. An attorney for plaintiffs agreed the letter was "[t]oxic" and worried that C.M. would "affect the other jurors" in the case. Although the court acknowledged the hardship C.M. faced being on the jury given his job and his initial lack of cooperation, it observed that "[n]ow he is taking notes" and being "very attentive." Due to the letter and discussion among the parties, the court decided to question C.M. in chambers with the parties' attorneys present.

¶ 39    During that questioning, C.M. informed the trial court that he had not discussed the substance of his letter with any other jurors. C.M. reiterated his frustration with the pace of the case, but confirmed with the court that, as stated in his letter, he was keeping an open mind about the case and its outcome. Upon questioning by an attorney for Monsanto, C.M. acknowledged his verdict had to be based on the facts and the law, and it could not be based on ancillary issues related to the parties' attorneys and their performance. Despite this, C.M. remarked: "[I]f I'm being 100 percent honest, do I think that—you know, I mean, understanding that you need to set that aside, but that's still going to resonate with me." When the Monsanto attorney followed up to confirm whether C.M. would base his verdict on the facts and law alone, C.M. responded, "I will give it my best attempt" and then asserted, "I will—I will do so." The Monsanto attorney observed that C.M., as a juror, was "sworn to do so, right?" C.M. responded, "[y]es."

¶ 40    After C.M. left the trial court's chambers, the court observed that C.M. had not shared his concerns with the other jurors. Still, the court asserted that a juror should not be critiquing how an attorney handled a case. One of plaintiffs' attorneys, however, believed that C.M. had already formed a negative opinion about their case based on his view of their attorneys. While the attorney conceded that C.M. stated he would follow the law, the attorney believed his response was purely perfunctory. To this end, plaintiffs sought to remove C.M. for cause. Objecting to the request, an attorney for Monsanto argued that C.M. simply appeared frustrated about the process and could feel the same way when Monsanto presented its case. Given that one juror had already been excused for a medical issue, the trial court was hesitant to remove C.M., though an attorney for plaintiffs stated they would accept a verdict of less than 12 jurors, if necessary. Nevertheless, after observing that C.M. stated in his letter he was keeping an open mind and had made no prejudgments about the outcome of the case, the court allowed C.M. to remain on the jury.

¶ 41    Litigants are entitled to a panel of jurors who will judge a case without prejudice or bias. *Kingston v. Turner*, 115 Ill. 2d 445, 464 (1987). The party challenging an allegedly biased juror has the burden to show the juror is biased. *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 48 (1993). Mere suspicion of bias is insufficient. *Id.* In situations of alleged actual bias by a juror, " '[t]he determination of whether or not the prospective juror possesses the state of mind which will enable him to give to an accused a fair and impartial trial rests in the sound discretion of the trial judge.' " *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 45 (quoting *People v. Cole*, 54 Ill. 2d 401, 414 (1973)). Because the determination of whether a juror possesses actual bias is an issue of fact for the trial court, we cannot reverse that determination unless it is against the manifest weight of the evidence. *Id.* ¶¶ 45-46. A determination is against the manifest weight of

the evidence if it is unreasonable, arbitrary, not based on the evidence, or if the opposite conclusion is clearly evident. *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 17.

¶ 42    In the instant case, there were two points, according to plaintiffs, when the trial court should have dismissed C.M. from the jury for cause. The first instance occurred in a sidebar during opening statements when plaintiffs objected to C.M.'s presence on the jury. The second instance was following C.M.'s letter to the court. At all times, however, the court was in the best position to judge C.M.'s ability to follow its instructions and remain impartial, given that it was able to observe C.M. in person, resulting in it having the "superior ability" to assess his credibility and demeanor compared to us reviewing the record cold. *People v. Adkins*, 239 Ill. 2d 1, 21 (2010). And each time plaintiffs asked the court to remove C.M. from the jury, it found him fit to serve, all determinations that, based on the circumstances, were reasonable.

¶ 43    At the time of plaintiffs' first objection to C.M. being on the jury during opening statements, C.M. merely had expressed frustration with serving on a lengthy trial due to his job as a commissioned salesperson. While we do not doubt that, off of the record, C.M. told one of plaintiffs' attorneys he was not going to listen, this comment does not mean C.M. was biased against plaintiffs. Rather, it exemplifies C.M.'s initial cantankerous attitude toward serving as a juror. See *Commonwealth v. Chambers*, 109 N.E.3d 1069, 1076 (Mass. App. Ct. 2018) ("Indeed, at its core, this juror's concerns centered on his frustration about the inconvenience inherent in performing jury service. It did not reflect partiality or bias such that retaining him constituted reversible error."). And so, instead of removing C.M., the court made a rational decision to admonish him about the seriousness of serving as a juror and to warn him of the consequences for failing to take the matter seriously.

¶ 44    Citing to *People v. Sims*, 2021 IL App (1st) 172020-U, plaintiffs argue that a juror who is openly resentful about having to serve on a jury based on personal or financial hardship must be dismissed. But in *Sims*, the juror facing financial hardship told the trial court that the hardship " 'could influence' " his ability to serve as a juror. *Id.* ¶ 49. And despite that juror "never once profess[ing] his ability to remain impartial," the trial court mistakenly believed that the juror stated he could be impartial and kept him on the jury. *Id.* Because the trial court believed the juror stated that he could remain impartial where such evidence was lacking, the appellate court found the trial court's determination was against the manifest weight of the evidence. *Id.*

¶ 45    In contrast to *Sims*, while C.M. undoubtedly expressed his frustration and unhappiness with serving as a juror and voiced those sentiments by telling an attorney for plaintiffs that he was not going to listen, C.M. never professed an inability to remain impartial based on his frustration. Moreover, unlike the trial court in *Sims*, the trial court in this case did not misconstrue the record related to C.M. when keeping him as a juror. Consequently, the trial court's determination to keep C.M. on the jury, following plaintiffs' request to remove him during opening statements, is not against the manifest weight of the evidence.

¶ 46    When plaintiffs sought to have C.M. removed from the jury the second time, C.M. had critiqued the performance and preparation of plaintiffs' attorneys in his letter to the trial court. But he did so in the context of remaining frustrated about serving as a juror and the time it was taking away from his job. Despite criticizing plaintiffs' attorneys in the letter, C.M. asserted that he had not prejudged the case and was keeping an open mind about its outcome. For all we know, C.M. might have had the same critiques about Monsanto's attorneys and their presentation of the case given his overall frustration about being a juror. It just so happened that C.M.'s impatience and frustration manifested itself during plaintiffs' case. See *Golden v. Kishwaukee Community Health*

*Services Center, Inc.*, 269 Ill. App. 3d 37, 47-48 (1994) (concluding the trial court did not err in failing to conduct an inquiry into a juror's impartiality after the juror sent the court a letter during the plaintiff's case stating it was " 'difficult to remain unbiased in the case' " because it is natural for jurors to have certain feelings during the plaintiff's case and those feelings could change during the defendant's case).

¶ 47    In spite of C.M.'s critiques and his past expression that he was not going to listen, the trial court found that C.M. had become "very attentive" at trial and appeared to be taking his role seriously. Certainly, when asked if he could set aside his opinions about plaintiffs' attorneys and base his verdict on the facts and law alone, he equivocated, initially asserting that his beliefs about plaintiffs' attorneys would still "resonate" with him. "An equivocal response by a prospective juror does not necessitate striking the prospective juror for cause where [he] later states that he will try to disregard his bias." *People v. Hobley*, 159 Ill. 2d 272, 297 (1994). But then, C.M. told the court that he would try to disregard his bias, stating he would give it his "best attempt" and "I will—I will do so." Moreover, he agreed that he was sworn to only base his verdict on the facts and law.

¶ 48    That is to say, although C.M. equivocated about whether he could set aside his beliefs about plaintiffs' attorneys and base his verdict on the facts and law alone, he ultimately informed the court that he would do so or, at the very least, attempt to do so as best as he could. See *id.* Under the circumstances, the trial court could reasonably find C.M. fit to serve as a juror. See *People v. Buie*, 238 Ill. App. 3d 260, 277 (1992) (finding the trial court did not err in refusing to excuse a potential juror for cause where she was close friends with a Chicago police officer, and in response to the court's question of whether she could honor her oath as a juror, she responded " '[i]t would be difficult not to hear his opinion which I have heard for over eight or ten years. I could probably try' " and later added that "she would make every effort to put aside the conversations she had

with her police officer friend and [then] repeatedly affirmed her ability to honor her oath as a juror"); *People v. Tipton*, 222 Ill. App. 3d 657, 664-65 (1991) (finding the trial court did not err in refusing to excuse a potential juror for cause in a jury trial for aggravated criminal sexual assault where the juror's sister had been the victim of a sexual assault and while she "initially express[ed] that she 'might' have some difficulty being impartial, she clearly indicated that she would do her best to abide by her oath as a juror"); *People v. Johnson*, 162 Ill. App. 3d 952, 954-55 (1987) (finding the trial court did not err in refusing to excuse a potential juror for cause in a jury trial for armed robbery based on a firearm where the juror told the court that she " 'would try' " to render a verdict based on the facts of the case and try to set aside her preexisting opinions about the need for gun control).

¶ 49    Although plaintiffs acknowledge that C.M. eventually told the trial court that he would base his verdict solely on the facts and the law, they argue, in essence, that his response was merely perfunctory. But the individual in the best position to determine the sincerity of C.M.'s affirmation was the trial judge, who observed his demeanor when doing so, not this court reviewing the record cold. See *Adkins*, 239 Ill. 2d at 21. The court did not find his responses insincere. Based on the statements in C.M.'s letter that he had not prejudged the case and was keeping an open mind about its outcome, the court reasonably found C.M.'s ability to remain impartial intact, despite the earlier equivocation and critiques of plaintiffs' attorneys.

¶ 50    Still, citing to several cases, including *People v. Handley*, 2023 IL App (2d) 220263-U, *People v. Johnson*, 215 Ill. App. 3d 713 (1991), *People v. Stone*, 61 Ill. App. 3d 654 (1978), plaintiffs argue that equivocating jurors who struggle to firmly and unambiguously commit to fairness should not be allowed to continue serving on a jury. In *Handley* and *Johnson*, the appellate court concluded that jurors should have been removed for cause because they equivocated about

their ability to be impartial and either had been the victim of a crime or had a family member or close friend who was the victim of a crime. *Handley*, 2023 IL App (2d) 220263-U, ¶¶ 5, 27; *Johnson*, 215 Ill. App. 3d at 717, 724. But in the instant case, while C.M. equivocated about his ability to be impartial, he ultimately told the trial court that he would give it his "best attempt" and "I will—I will do so" in regard to judging the case only on the facts and the law. See *Hobley*, 159 Ill. 2d at 297 ("An equivocal response by a prospective juror does not necessitate striking the prospective juror for cause where the prospective juror later states that he will try to disregard his bias."). What is lacking here, in contrast to *Handley* and *Johnson*, is equivocation coupled with some other element that plaintiffs can point to predisposing C.M. to being biased against them. But if anything, that predisposition for C.M. to be biased would be against Monsanto, as C.M.'s family grew up on a farm where Roundup was used and multiple family members of his, including his mother, who grew up on that farm, passed away from cancer. C.M. even remarked that he had a strong opinion about Monsanto, based on his existing knowledge of its litigation history. To this end, it was Monsanto who originally sought to remove C.M. from the jury pool, based on this potential bias, with plaintiffs asking the court to keep him in the jury pool.

¶ 51    Meanwhile, in *Stone*, 61 Ill. App. 3d at 667, the appellate court concluded that jurors should have been removed for cause because "the record [was] replete with expressions of self-doubt concerning their ability to be impartial," and while each juror displayed "an occasional hint of neutrality," each also "displayed marked signs of prejudice." But the jurors' signs of prejudice came in the form of them refusing to accept fundamental tenets of the criminal justice system— the presumption of innocence, the State having the burden of proof, and guilt only after proof beyond a reasonable doubt. *Id.* at 663-666. In the present case, in contrast to *Stone*, C.M. never refused to accept a fundamental principle of law. Although he expressed some concern about his

ability to be impartial, given his beliefs about plaintiffs' attorneys, he ultimately informed the trial court that he would do his best and later that he would base his verdict on the facts and law alone. Consequently, the trial court's determination to keep C.M. on the jury following the writing of his note was not against the manifest weight of the evidence.

¶ 52                    C. Continuance for COVID-19

¶ 53    Lastly, plaintiffs contend that the trial court erred by failing to grant their request for a continuance or, in the alternative, a mistrial, when their two lead trial attorneys developed COVID-19 and could not continue representing them at trial.

¶ 54    When the trial began on August 1, 2023, attorney Scott Frieling gave plaintiffs' opening statement. He and attorney Allen Stewart led the direct examination of all of plaintiffs' live witnesses with the exception of the testimony of plaintiffs themselves, which was led by attorney Walter Cubberly. Plaintiffs' case took approximately three weeks and ended on August 21, 2023. Monsanto's case began later that day with Dr. Fred Kohanna, who testified as an adverse witness. Attorney Christopher Johnson questioned Dr. Kohanna on behalf of plaintiffs, and then Frieling and Stewart cross-examined two other Monsanto witnesses through August 24, 2023. The following day, Dr. Donna Farmer, a Ph.D., who was a senior science fellow and toxicologist at Bayer Crop Science, the parent company of Monsanto, testified, with her direct examination taking the entire day. Following her testimony that day, the case adjourned for the weekend.

¶ 55    On Monday, August 28, 2023, outside the presence of the jury, Cubberly informed the trial court that Stewart, as well as other members of plaintiffs' team, had tested positive for COVID-19. Cubberly tested negative, and while Frieling had also tested negative, according to Cubberly, Frieling was symptomatic for COVID-19. Both Stewart and Frieling were absent from the courtroom. So, too, were plaintiffs themselves because they were immunocompromised. Because

of the illnesses to Stewart and Frieling, plaintiffs moved for a mistrial. The court, however, remarked: "No, no. I realize that some of your counsel here is not able to complete, but we are now in the defense's case and we were scheduled to complete this next week, and there has been no less than eight or nine lawyers." Cubberly noted that Stewart and Frieling were the two lead trial attorneys for plaintiffs and argued it would be unduly prejudicial to plaintiffs to continue without them.

¶ 56    An attorney for Monsanto objected and noted it planned to finish its case by Thursday, August 31, 2023. Monsanto's attorney suggested that Stewart and Frieling could proceed remotely, something Monsanto had utilized in previous trials and was willing to set up for plaintiffs. Initially, the court was "inclined" to pause the trial for a day or two, but one of Monsanto's attorneys stated that it could play videotaped evidence depositions. Cubberly, however, asserted that the situation was dangerous for the jurors, and Stewart and Frieling had "done the majority of the prep work" for the remaining witnesses. Ultimately, the court denied plaintiffs' motion for a mistrial, explaining that there had already been an "enormous effort in selecting this jury, [an] enormous effort in putting on witnesses and taxing this jury with half-hour lunches and having 12-hour days." Given Monsanto's assertion that it could finish its case within the week, the court stated: "We are right there at the finish line. This is not going to be dismissed. There is no mistrial basis. We have technology. Get it together." The court also remarked: "We know the circumstances you have, but you are not going to convince the Court that there are not viable alternatives to salvage this enormous effort made by both sides." In turn, the court instructed Cubberly to have Stewart participate remotely and directed the parties not to make any mention of COVID-19, fearing the impact on the jury. Back in the presence of the jury, the court noted that some members of the

parties were wearing masks due to an attorney experiencing flu-like symptoms and the "sniffling attorney" would be able to participate remotely.

¶ 57    Monsanto resumed the direct examination of Dr. Farmer. Instead of plaintiffs cross-examining Dr. Farmer that day, Monsanto played two videotaped evidence depositions from Dr. Priyank Patel, who treated Evard, and Dr. Pramern Sriratana, who treated Wiechmann. While the trial was occurring that day, Stewart and Frieling submitted declarations, asserting that they both had tested positive for COVID-19 and their symptoms were severe enough that they could not participate at trial, even remotely, and could not effectively represent plaintiffs until their symptoms dissipated and they tested negative for COVID-19.

¶ 58    Later in the evening of August 28, 2023, plaintiffs filed a written motion seeking a continuance or, in the alternative, a mistrial, due to Stewart and Frieling testing positive for COVID-19 and being unable to participate effectively in person or remotely. Plaintiffs requested that the court pause the trial until Stewart and Frieling were "recovered and test negative" for COVID-19. They argued this relief was appropriate because they hired Stewart and Frieling based on their experience and expertise in the subject matter and one of them was scheduled to deliver plaintiffs' closing argument. Plaintiffs asserted that because the jurors were provided a firm trial end date of September 8, 2023, and were not questioned about their hardships after that date, should a continuance result in an inability to complete the trial by that date, they would be constrained to move for mistrial. Plaintiffs also asked the court to provide the jury the reason for their and their lead attorneys' absence. Stewart filed a supplemental declaration, wherein he asserted that, due to his symptoms, he went to the emergency room. There, he was told that he should isolate and avoid being in the presence of other people until September 6, 2023.

¶ 59    Monsanto filed a response to plaintiffs' motion, in part, highlighting that, although their lead trial attorneys were ill, they still had six attorneys from various law firms representing them, all of whom were highly competent with extensive experience in toxic tort litigation. During argument on plaintiffs' motion, John Boundas, another one of plaintiffs' attorneys, noted that he had not been at the trial because Stewart and Frieling had been the lead trial attorneys and that he just flew into Chicago the morning prior. The trial court observed that Monsanto offered to facilitate the technology to allow Stewart and Frieling to participate, even if just as observers, which would allow them to be involved in conversations "at the table," as they normally would, but plaintiffs did not accept. The court found that plaintiffs did not establish sufficient prejudice, given that the threat of COVID-19 has been persistent, the technology was available to assist in such situations, and multiple other attorneys who had been representing plaintiffs beyond Stewart and Frieling were available. The court accordingly denied plaintiffs' motion, and the case continued without the participation of Stewart and Frieling.

¶ 60    Ultimately, five days of trial, including closing argument, occurred without Stewart and Frieling. And during that time, Monsanto presented the live testimony of two witnesses. The first witness was Dr. Farmer, from Monsanto, who had over 20 years of experience working with glyphosate as a toxicologist. He testified about various scientific studies on causation and the company's interactions with the United States Environmental Protection Agency. Cubberly cross-examined Dr. Farmer for plaintiffs on August 29, 2023. The second witness was Dr. Nakhle Saba, a medical doctor and professor of medicine at Tulane University, who testified as an expert on causation. Boundas cross-examined Dr. Saba for plaintiffs beginning on August 30, 2023. As noted, Monsanto also presented videotaped evidence depositions of Dr. Patel and Dr. Sriratana.

And, on September 1, 2023, Cubberly presented plaintiffs' closing argument, and both he and Boundas presented plaintiffs' rebuttal closing argument.

¶ 61 Litigants do not have the absolute right to a continuance. *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 22. While certain circumstances mandate continuances (see, *e.g.*, 735 ILCS 5/2-1007 (West 2022); Ill. S. Ct. R. 231 (eff. Jan. 1, 1970); Cook Co. Cir. Ct. R. 5.2 (eff. July 1, 1976)), those circumstances are not present here. Rather, in this case, the general rules apply. "On good cause shown, in the discretion of the court and on just terms, additional time may be granted for the doing of any act or the taking of any step or proceeding prior to judgment." 735 ILCS 5/2-1007 (West 2022). "The circumstances, terms and conditions under which continuances may be granted, the time and manner in which application therefor shall be made, and the effect thereof, shall be according to rules." *Id.* In turn, our supreme court rules acknowledge that the circumstances for a continuance change once a case has reached trial. See Ill. S. Ct. R. 231(f) (eff. Jan. 1, 1970). Once a trial has commenced, a party may not seek a continuance "unless a sufficient excuse is shown for the delay." *Id.* In other words, "the party seeking a continuance must provide the court with especially grave reasons for a continuance once the case has reached the trial stage because of the potential inconvenience to the witnesses, the parties, and the court." *In re Marriage of Ward*, 282 Ill. App. 3d 423, 430-31 (1996).

¶ 62 When determining whether to grant a continuance, the trial court has broad discretion (*Doe v. Parrillo*, 2021 IL 126577, ¶ 65), but it should grant one "where the ends of justice clearly require it." *Curtin v. Ogborn*, 75 Ill. App. 3d 549, 553 (1979). Indeed, the illness of a party's trial attorney may require a continuance. See *In re Marriage of Ward*, 282 Ill. App. 3d at 431. A reviewing court will not reverse the trial court's decision on a continuance "absent a clear abuse of discretion," which depends upon the facts and circumstances of the case. *Doe*, 2021 IL 126577, ¶ 65. The court

abuses its discretion when its decision is unreasonable, fanciful or arbitrary, or where no reasonable person would agree with the court. *Haage v. Zavala*, 2021 IL 125918, ¶ 40. Even where the court should have granted the continuance, we will not reverse unless the complaining party was "prejudiced by the denial." *In re R.D.*, 2021 IL App (1st) 201411, ¶ 30.

¶ 63 In the instant case, plaintiffs' motion for a continuance required the trial court to balance several competing interests: the inconvenience to Monsanto, the jury, and the court versus the plaintiffs being deprived of their lead trial attorneys for potentially the remainder of the trial. As the court noted in its earlier ruling on plaintiffs' oral motion for mistrial, the case was already nearing completion. By the time Stewart and Frieling had contracted COVID-19, four weeks of the trial had already been completed, including opening statements, all of plaintiffs' case, and the majority of Monsanto's live witnesses. As the court observed, by this point, the parties and the court had already expended enormous efforts in selecting a jury and presenting witnesses. Due to when Stewart and Frieling contracted COVID-19, the remaining case for Monsanto involved two live witnesses, Dr. Farmer and Dr. Saba; two videotaped evidence depositions; and closing arguments.

¶ 64 Because two of Monsanto's witnesses testified through videotaped evidence depositions, there was no need for Frieling or Stewart to do anything related to these witnesses—meaning, when the trial court was determining how to rule on plaintiffs' written motion for a continuance, what was left at trial were two live witnesses to be cross-examined and closing arguments. While plaintiffs' written motion for a continuance noted that one of Frieling or Stewart would deliver their closing arguments, there was no similar assertion that one of them would cross-examine Dr. Farmer and Dr. Saba. That omission may have been inadvertent, or it may have been telling, meaning it is possible that Stewart and Frieling were not the ones who would have cross-examined

Dr. Farmer or Dr. Saba. But even if logically, as plaintiffs' lead trial attorneys, Stewart or Frieling would have cross-examined Dr. Farmer and Dr. Saba, plaintiffs were nevertheless well aware of their expected testimony on direct examination based on the discovery conducted in the case and Dr. Farmer already having testified on direct examination for a day. Given this, the outline of the cross-examinations and the key questions to pose to Dr. Farmer and Dr. Saba were assuredly prepared in advance of Stewart or Frieling contracting COVID-19.

¶ 65    It may be true that Frieling and Stewart were the most prepared and qualified attorneys of plaintiffs to cross-examine Dr. Farmer and Dr. Saba. But it defies credulity to contend that other attorneys for the plaintiffs did not help craft the planned cross-examinations of Dr. Farmer and Dr. Saba or that Stewart and Frieling were the only two attorneys of theirs qualified and experienced enough to conduct those cross-examinations. Indeed, the attorneys who ended up cross-examining Dr. Farmer and Dr. Saba—Cubberly and Boundas, respectively—were involved in plaintiffs' case since nearly its inception. Boundas signed plaintiffs' initial complaint and deposed a key regulatory expert of Monsanto. According to his law firm biography, which was included in briefing on plaintiffs' motion for a continuance, he had practiced law for nearly 30 years with a concentration in complex mass tort litigation and had experience in multiple jury trials.

¶ 66    While Cubberly did not appear on plaintiffs' initial complaint, he first appeared in January 2020 and subsequently signed several of the most substantial briefings filed by plaintiffs, including their responses to Monsanto's motions for summary judgment, motions to exclude various expert witnesses, and more than 50 of their motions *in limine*. Cubberly also led several arguments during the parties' days-long pretrial hearings and led the direct examinations of the plaintiffs. While not as experienced as Boundas, Cubberly had been practicing law for well over 10 years at the time of trial. All of this is to say that plaintiffs knew of the general substance and character of the direct

examination testimony of Dr. Farmer and Dr. Saba—the only remaining live witnesses, had ample time to prepare for their cross-examinations, and had qualified attorneys conduct those cross-examinations in place of Stewart and Frieling. See *McMillen v. Carlinville Area Hospital*, 114 Ill. App. 3d 732, 739 (1983) (the competency of the attorney who ends up trying a case in place of an unavailable attorney is a key factor in determining whether the trial court erred in denying a continuance based on the attorney's unavailability).

¶ 67    The same holds true for plaintiffs' closing argument. They knew what their evidence had shown and generally what Monsanto's case was going to show. Under this backdrop, it strains credulity to argue that the outline of their closing argument had not been prepared ahead of Stewart and Frieling contracting COVID-19. We do not dispute that plaintiffs might have preferred Stewart or Frieling to cross-examine Dr. Farmer and Dr. Saba and deliver their closing arguments, based on their experience and substantial involvement in the case. Even so, this case is unlike *In re Marriage of DeWaele*, No. 3-09-0660 (2011) (unpublished order under Illinois Supreme Court Rule 23) and *People v. Myles*, 49 Ill. App. 3d 325 (1977), cases plaintiffs rely on where the appellate court reversed the trial court's denial of a continuance based on a substitute attorney's inability to handle a trial in place of the original trial attorney. In *Myles*, 49 Ill. App. 3d at 326-27, the substitute attorney had been licensed for three months and was forced to defend a murder trial, despite no felony trial experience. Although *DeWaele*, No. 3-09-0660, slip order at *4, may not be cited (see Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025)), the substitute attorney had been retained just three weeks before trial. Unlike *DeWaele* and *Myles*, in Boundas and Cubberly, plaintiffs had experienced attorneys—both legally and in the case itself—able to cross-examine the remaining critical witnesses and deliver their closing argument. See *Mireles v. Indiana Harbor Belt R.R. Corp.*, 154 Ill. App. 3d 547, 554 (1987) (asserting "[w]here more than one attorney is involved in

a case, the absence of one of the attorneys at the time of trial does not mean that the case should be continued, especially where the attorney who tries the case has had prior involvement in the case and is competent to try it").

¶ 68 Still, plaintiffs' attorneys do more during the defense's case than cross-examine witnesses, as trial strategy issues spontaneously arise and objections need to be made, among other items. Likewise, following the defense's case, plaintiffs' attorneys do more than deliver closing arguments, as other trial strategy issues spontaneously arise, and jury instructions must be crafted. But given that the trial was almost complete, with only two live witnesses and closing arguments remaining, coupled with the arduous path to the trial commencing, including the lengthy pretrial hearings and the jury selection process, the trial court reasonably determined that granting a continuance until Stewart and Frieling were recovered and tested negative for COVID-19, as plaintiffs requested, was not practical and was too inconvenient for Monsanto, the jury, and the court. Granting plaintiffs their requested continuance of indefinite duration would have pushed the case up against the firm trial end date of September 8, 2023, that the court provided to the jurors. To force jurors who had been involved in the case for already a month to pause and come back an indefinite number of days later would greatly inconvenience them and exacerbate the inconvenience of already serving on a month-long jury trial. See *In re Marriage of Ward*, 282 Ill. App. 3d at 430-31 (the potential resulting inconvenience to the jury is a paramount consideration when the trial court determines whether to allow a continuance during trial).

¶ 69 The trial court's decision was even more rational, considering that it provided plaintiffs every opportunity to use technology to ameliorate any adverse effects from the inability of Stewart and Frieling to participate in the trial in person. While due to their symptoms, as stated in their declaration, the lawyers could not cross-examine Dr. Farmer or Dr. Saba or deliver closing

arguments remotely, the court offered them the opportunity to at least observe the trial remotely and be available to participate in trial strategy discussions. However, the plaintiffs rejected the offer. Had plaintiffs requested a short continuance to see if Stewart or Frieling had improved enough to participate remotely and the trial court denied that request, such a decision might have been unreasonable. But here, plaintiffs asked the court to pause the trial indefinitely, causing great inconvenience to all, in particular the jury. Under these circumstances—particularly due to the case nearing its completion, the indefinite nature of plaintiffs' request, and their ability to still be represented by experienced attorneys who had been involved in the case since nearly its inception—plaintiffs did not provide the court with especially grave reasons to continue the trial indefinitely. See *Thomas v. Thomas*, 23 Ill. App. 3d 936, 940 (1974) (observing that, "[o]nce the parties and witnesses assembled for the trial proceedings, granting [the] plaintiff's request [for a continuance] would have caused great inconvenience to all of those gathered" and noting "the reluctance to grant a continuance after a trial has commenced"). In turn, we cannot say that the trial court acted unreasonably, fancifully, or arbitrarily in denying plaintiffs' motion for a continuance.

¶ 70 Moreover, beyond arguing in conclusory fashion that they were prejudiced by having to finish their trial without their two lead trial attorneys who were the most versed in the science and factual specifics of a complex tort case, plaintiffs point to nothing that Stewart or Frieling would or could have done differently than what Boundas and Cubberly actually did. See *In re R.D.*, 2021 IL App (1st) 201411, ¶ 30 (even if the trial court abuses its discretion in denying a continuance, reversible error occurs only if the complaining party was "prejudiced by the denial").

¶ 71 Nevertheless, in arguing for reversal based on Stewart and Frieling's illnesses, plaintiffs cite multiple cases, including *Loyola University of Chicago v. Onward MSO, LLC*, 2024 IL App

(1st) 230708-U, *Nowaczyk v. Welch*, 106 Ill. App. 2d 453 (1969), and *Kehrer v. Kehrer*, 28 Ill. App. 2d 296 (1960). In all three cases, the appellate court found that the trial court had abused its discretion in denying a continuance. However, those cases had not advanced to opening statements, the party seeking the continuance was represented by only one attorney, and the denial of the continuance either led to the plaintiff's case being dismissed for want of prosecution or precluded a defendant-corporation, who could not represent itself *pro se*, from participating at trial. See *Onward MSO*, 2024 IL App (1st) 230708-U, ¶¶ 21-26, 52; *Nowaczyk*, 106 Ill. App. 2d at 453-56, 462; *Kehrer*, 28 Ill. App. 2d at 297-98, 300. With such draconian results, it is understandable why the appellate court found error. But, in the present case, while plaintiffs' lead trial attorneys were absent, the plaintiffs still had multiple other experienced attorneys, who had been involved with the case since, in essence, its inception able to adequately represent them for the remaining portions of trial. Consequently, the trial court did not err in denying plaintiffs' motion for a continuance.

¶ 72     Relatedly, plaintiffs argue that the trial court erred by failing to inform the jurors of precisely what was occurring in the courtroom with plaintiffs' attorneys contracting COVID-19 and plaintiffs being absent because they were immunocompromised. According to plaintiffs, without an explanation, the jury might have believed that they and their attorneys had given up on their own case. "Generally, a trial judge should be afforded a wide latitude in his conduct of a trial, and a new trial will not be granted on the basis of a judge's remarks or conduct unless the remarks or conduct result in prejudice to a party." *Fitzpatrick v. ACF Properties Group, Inc.*, 231 Ill. App. 3d 690, 706 (1992). The court was placed in a difficult predicament, given that the trial was nearing completion. Perhaps the court should have been more transparent with the jurors and told them exactly what was occurring. But understandably, the court was concerned with having a sufficient

number of jurors being able to deliberate, as one juror already had to be excused during the trial for medical reasons. While plaintiffs did agree to accept a verdict of less than 12 jurors (as related to the issue of C.M. potentially being excused), the court made a rational decision to try not to cause panic amongst the jurors and divert their focus away from the evidence at trial.

¶ 73     Lastly, plaintiffs contend, in conclusory fashion, that the trial court also erred in failing to grant them their alternate relief of a mistrial, but they do not provide any case law on the standards for granting mistrials. For this reason, any contention related to the court's failure to grant a mistrial is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 74                                   III. CONCLUSION

¶ 75     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 76     Affirmed.

*Evard v. Monsanto Co.*, **2025 IL App (1st) 241235**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 19-L-11574, 22-L-8925, 22-L-8927, 22-L-8928; the Hon. Sandra G. Ramos, Judge, presiding. |
| **Attorneys for Appellant:** | Thomas T. Boundas, of Thomas T. Boundas & Associates, of Willowbrook, and Martin J. Siegel, of Law Offices of Martin J. Siegel, P.C., of Houston, Texas, for appellants. |
| **Attorneys for Appellee:** | Stefani L. Wittenauer, of Bryan Cave Leighton Paisner LLP, of St. Louis, Missouri, and Samuel E. Hofmeier (*pro hac vice*), of Bryan Cave Leighton Paisner LLP, of Kansas City, Missouri, for appellee. |